UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL S., <br><br> Plaintiff, <br><br> v. <br><br> KILOLO KIJAKAZI, <br> Acting Commissioner of Social Security, <br><br> Defendant. | Case No. 21 C 2169 <br><br> Magistrate Judge Sunil R. Harjani |

### MEMORANDUM OPINION AND ORDER

Plaintiff Michael S. brings this action for judicial review of the Social Security Administration's decision denying his application for Disability Insurance Benefits ("DIB"). For the following reasons, Plaintiff's request for reversal and remand [14] is granted, and Defendant's Motion for Summary Judgment [19] is denied.

### I. BACKGROUND

Michael was born on November 6, 1971 and filed an application for DIB alleging he became disabled on June 9, 2017 due to bipolar disorder, anxiety, and obsessive compulsive disorder. Michael has experienced depressive symptoms and bipolar disorder since college. The record also indicates that Michael has been diagnosed with post-traumatic stress disorder. He has been prescribed numerous medications for his mental health in the past, including Fluoxetine, Tegretol, Lithium, Depakote, Lurasidone, Risperdal, Zyprexa, Abilify, Geodon, Lamictal, Mirtazapine, and Vraylar, which he says provided little to no improvement. He reports that most medications have had side effects or triggered hypomania. Michael also received two Ketamine

infusion treatments, which he said seemed to help but he could not afford further treatments.[1] Michael underwent transcranial magnetic stimulation ("TMS") treatments, but he testified that the TMS treatments led to hypomania and then a more depressed state.[2] Michael believes the TMS treatments destabilized him and left him in a worse condition than he has ever been. Michael further testified that he was currently taking Seroquel, which he had been taking on and off for 16 years. Michael said the Seroquel helps a little with his symptoms but not as well as it used to. In December 2020, Michael's psychiatrist discussed electroconvulsive therapy ("ECT") treatments, but he was afraid of side effects like memory loss. Michael's mental health treatment has also consisted of group and individual therapy.

Michael has a college degree in marketing and previously worked as a customer service representative and baker at a grocery store. At the hearing, Michael explained that he had been able to work previously because he was taking an experimental drug as part of a study which had improved his functioning. When the study ended, he was unable to continue the experimental medication and his condition deteriorated. Michael last worked in June 2017 and was fired from that job when he was not meeting his job duties and missed too many days of work.

Following the administrative hearing, ALJ Paul Sher issued a decision on November 19, 2020, finding that Michael was not disabled. (R. 391-402). The ALJ determined that Michael had the severe impairments of bipolar disorder, obsessive-compulsive disorder, and anxiety disorder. *Id*. at 394. The ALJ found that Michael's impairments did not meet or medically equal a listed

---

[1] "Ketamine is an intravenous, rapidly-acting antidepressant used for persons with treatment-resistant depression." *Santiago v. Saul*, 2020 WL 1083573, at *2 n.2 (E.D. Mo. March 6, 2020).

[2] "Transcranial magnetic stimulation (TMS) is a noninvasive procedure that uses magnetic fields to stimulate nerve cells in the brain to improve symptoms of depression. TMS is typically used when other depression treatments haven't been effective." https://www.mayoclinic.org/tests-procedures/transcranial-magnetic-stimulatio/about/pac20384625 (last visited November 7, 2022).

impairment. *Id*. at 394-95. In particular, the ALJ considered listings 12.04 and 12.06. *Id*. The ALJ concluded the "paragraph B" criteria had not been satisfied, but Michael had limitations in all four broad areas of functioning. *Id*. The ALJ found a mild limitation in understanding, remembering, or applying information and moderate limitations in interacting with others, concentration, persistence, or pace, and adapting or managing oneself. *Id*. The ALJ then concluded that Michael had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following non-exertional limitations: he "can understand, remember, and carry out simple instructions; perform simple, routine, and repetitive tasks but not at a production rate pace such as an assembly line; adapt to routine changes in the workplace that are infrequent and easily explained; and interact occasionally with supervisors and coworkers, and the general public." *Id*. at 393-401. The ALJ determined that Michael could not perform his past relevant work as a baker and customer service representative, but there were other jobs that existed in significant numbers in the national economy that he could perform, including laundry worker, warehouse worker, and industrial cleaner. *Id*. 401-02. As a result, the ALJ found Michael not disabled from June 9, 2017 through the date of the decision. *Id*. at 402.

After the ALJ issued his decision, Michael asked the Appeals Council to review his claim. In support, he submitted 376 pages of additional records from Access Community Health Network ("Access") dated December 24, 2018 through September 18, 2020. (R. 12-387). The Appeals Council denied Michael's request for review on February 23, 2021, stating that the additional evidence "does not show a reasonable probability that it would change the outcome of this case." *Id*. at 1-6. Michael then filed the instant action for judicial review under 42 U.S.C. § 405(g).

## II. DISCUSSION

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform his former occupation; and (5) whether the claimant is unable to perform any other available work in light of his age, education, and work experience. 20 C.F.R. § 404.1520(a)(4); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a)(4). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868 (internal quotation marks omitted).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, --- U.S. ----, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted). In reviewing an ALJ's decision, the Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (internal quotation marks

omitted). Nevertheless, where the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

Michael argues that the ALJ's decision should be reversed and remanded for three reasons. First, he contends that the ALJ's mental RFC finding lacks the requisite substantial support in the record. Second, Michael contends that the ALJ erred in assessing the opinion of his treating psychiatrist Sharon Lieteau, M.D. Third, he argues the ALJ inadequately evaluated his subjective symptoms.[3] The Court finds that remand is justified based on Michael's second argument regarding the ALJ's evaluation of the treating opinion of Dr. Lieteau and therefore, does not address Michael's remaining arguments.

The ALJ's evaluation of the medical opinion evidence in Michael's case was subject to new regulations pertaining to claims filed on or after March 27, 2017. 20 C.F.R. § 404.1520c (2017). Under the new regulations, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a). An ALJ need only articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [a claimant's] case record." 20 C.F.R. § 404.1520c(b). The regulations direct the ALJ to consider the persuasiveness of medical opinions using several listed factors, including supportability, consistency, relationship with the claimant, specialization, and other factors that tend to support or contradict a medical opinion or prior administrative medical finding. 20 C.F.R. § 404.1520c(a), (c). The most important factors when evaluating persuasiveness are supportability and consistency. 20 C.F.R. § 404.1520c(a). An ALJ must explain how he

---

[3]  Michael withdrew his constitutional challenge to the appointment of Andrew Saul as the Commissioner of Social Security. Doc. 23; *see also* Doc. 21 at 14.

considered the factors of supportability and consistency in his decision, but he is not required to explain how he considered the other factors. 20 C.F.R. § 404.1520c(b)(2).

As part of his challenge to the ALJ's rejection of Dr. Lieteau's opinion in formulating his RFC, Michael argues that the ALJ failed to fully and fairly develop the record. To support this assertion, Michael points out that the record did not contain treatment notes from Dr. Lieteau who treated him for his mental impairments. The Court agrees that the ALJ failed to ensure a sufficiently complete record to fairly evaluate whether Michael is disabled and therefore, remand is required for the ALJ to assess Dr. Lieteau's treatment notes.

Michael treated with Access from December 24, 2018 through September 28, 2020 for both his mental and physical health issues, and that treatment included Michael seeing Dr. Lieteau for his mental impairments beginning in September 2019. On June 3, 2020, Dr. Lieteau completed a Mental Residual Functional Capacity Statement form. (R. 915-21). Dr. Lieteau reported a diagnosis of bipolar disorder and a guarded prognosis. *Id*. at 915. She assigned Michael a GAF score of 55. *Id*. Dr. Lieteau assessed Michael's mental abilities in 20 work related areas under the categories of understanding and memory, concentration and memory, social interaction, and adaption. *Id*. at 917, 919. On a scale ranging from category I (no performance preclusion) to category IV (precludes performance for 15% or more of an 8-hour work day), she rated 2 abilities as category IV and 11 abilities as category III. *Id*.[4] She opined that Michael would be off task

---

[4] Dr. Lieteau rated two of Michael's mental abilities as falling within category IV: (1) perform activities within a schedule, maintain regular attendance, and be punctual and within customary tolerances; and (2) complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (R. 917). Dr. Lieteau checked that Michael has a category III limitation in the following areas: (1) remember location and work-like procedures; (2) understand and remember very short and simple instructions; (3) understand and remember detailed instructions; (4) carry out detailed instructions; (5) maintain attention and concentration for extended periods of time; (6) sustain an ordinary routine without special supervision; (7) interact appropriately with the general public; (8) accept instructions and respond appropriately to criticism from supervisors; (9) respond appropriately to changes in the work setting; (10) travel in

more than 30% of an 8-hour work day and miss 3 days of work per month due to his mental impairment. *Id*. at 919. She further opined that Michael would be able to perform a job on a sustained, consistent, useful and routine basis without continuous supervision or undue interruptions and distractions about 40% of the time. *Id*. Dr. Lieteau also indicated that Michael was unable to obtain and retain work in a competitive work environment, 8 hours per day, 5 days per week. *Id*. at 921. She based her opinion on Michael's "ongoing psychiatric outpatient treatment." *Id*. If Dr. Lieteau's opinions about Michael's functional limitations had been credited, Michael would have been found disabled. *Id*. at 442.

When determining Michael's RFC, the ALJ found Dr. Lieteau's opinions not persuasive. (R. 399). The ALJ provided four reasons for rejecting Dr. Lieteau's opinion. First, he found that Dr. Lieteau's actual opinion "did not provide specific support for her findings." (R. 399). Second, the ALJ found that Dr. Lieteau's records reflecting medication changes did not support her proposed limitations. *Id*. Third, the ALJ pointed out that Dr. Lieteau "did not explain how a GAF score of 55 is consistent with the extreme limitations she assessed." *Id*. Fourth, the ALJ found Dr. Lieteau's assessment inconsistent with the other opinion evidence of record. *Id*. The Court addresses each of these reasons below and finds that substantial evidence does not support the ALJ's dismissal of Dr. Lieteau's opinions because the ALJ did not have access to Dr. Lieteau's treatment notes.

Taking the ALJ's first two reasons in reverse order, the ALJ's conclusion that Dr. Lieteau's opinions were unpersuasive because of the absence of objective support in her records reflecting medication changes is undercut by the ALJ's failure to develop the record to include Dr. Lieteau's

---

unfamiliar places or use public transportation; and (11) set realistic goals or make plans independently of others. *Id*. at 917, 919. A category III limitation precludes performance for 10% of an 8-hour work day. *Id*. at 915.

treatment notes. "While a claimant bears the burden of proving disability, the ALJ in a Social Security hearing has a duty to develop a full and fair record." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009); *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). "Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 111 (2000). Specifically, the ALJ must develop a claimant's "complete medical history" for at least the 12 months preceding the month in which the claimant filed his application. 20 C.F.R. § 404.1512(b)(1). The ALJ must "make every reasonable effort" to help the claimant get reports from his medical sources, a process which entails making an initial request and, if not received, "one follow-up request to obtain the medical evidence necessary to make a determination." *Id*. at § 404.1512(b)(1)(i); Social Security Ruling 96–5P, 1996 WL 374183, at *6 (July 2, 1996) ("[I]f the evidence does not support a treating source's opinion . . . and the ALJ cannot ascertain the basis of the opinion from the case record, the [ALJ] must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion."). In the end, the "case record must be complete and detailed enough to allow [the ALJ] to make a determination or decision about whether [the claimant is] disabled or blind." *Id*. at § 404.1512(a)(2). Remand is warranted if the ALJ fails to fulfill his duty to adequately develop the record. *Smith*, 231 F.3d at 437.

Turning to the evidence in this case, there was an ambiguity that warranted further development of the record by the ALJ. First, the records submitted from Access contained certain treatment notes from psychiatrist Viktoria Erhardt, M.D., who treated Michael between January 2019 and August 2019. (R. 834-37, 864-66, 873-75, 881-83, 889-95). But Michael also treated with Dr. Lieteau at Access from September 2019 through December 2020, and the record before the ALJ did not include any similar treatment notes from Dr. Lieteau. Second, during the

8

November 5, 2020 administrative hearing, the ALJ asked Michael about how often he was seeing Dr. Lieteau. *Id*. at 423. Michael said that he usually saw Dr. Lieteau every four weeks "[b]ut lately or over the past several months or maybe even a year, I've seen her about every two weeks because I was having so many issues." *Id*. The ALJ then specifically asked Michael whether his appointments with Dr. Lieteau were "just medication reviews or is there more to it than that?" *Id*. at 424. Michael informed the ALJ that his appointments with Dr. Lieteau were for "medication but usually they're anywhere from 15 minutes to a half an hour. It's medication and I also . . . discuss problems and issues and stuff with her as well and she make suggestions." *Id*. Michael's testimony strongly suggested that there was a gap in the evidence—specifically, missing treatment notes from Dr. Lieteau.[5]

In light of this apparent gap, the ALJ should not have rejected Dr. Lieteau's opinion as unsupported, without making a further effort to obtain treatments notes from Dr. Lieteau. *Paul v. Berryhill*, 760 F. App'x 460, 464 (7th Cir. 2019) (ALJ should have contacted consultative psychologist if he thought 6-page narrative report was "vague or not specific in terms of functioning" as he stated in his decision). The ALJ did not probe the issue further by following up with Michael's counsel at the hearing or after the hearing to determine the status of Dr. Lieteau's treatment notes or attempt to contact Dr. Lieteau asking for treatment notes that supported her opinion before denying benefits. *See* 20 C.F.R. § 404.1520b(b)(2)(i) (the ALJ "may recontact [a claimant's] medical source" if the evidence is insufficient or inconsistent); *Moore v. Colvin*, 743 F.3d 1118, 1127 (7th Cir. 2014); *Cheryl T. v. Kijakazi*, 2022 WL 3716080, at *10 n.6 (N.D. Ill.

---

[5] The reason for the incomplete medical records is not clear other than a possible administrative error on Access's part. On July 31, 2020, Michael's counsel requested "all of [Michael's] records from Access Community Health Network for progress notes and test results from 7/10/2019 to present, including but not limited to . . . psychological, psychiatric or other behavioral or mental health services, case management progress notes." (R. 923).

July 20, 2022) (if the ALJ "could not discern what the basis for [the treating physician's] opinion was, he could have elected, at his discretion, to recontact [the physician] to clarify.").

Rather, in discussing the evidence from Access, the ALJ expressly acknowledged that treatment notes were missing from the record. When summarizing the medical record, the ALJ noted that the treatment records from Access from July 15, 2019 through July 28, 2020, "which include treatment with Sharon Lieteau, M.D., reflect ongoing appointments and medication changes; however, there are no objective signs or symptoms noted in the record." (R. 398). The ALJ continued: "[t]he treatment notes only note medication changes, such as varying trials of Depakote, Latuda, Seroquel, Zyprexa, Prozac, Remeron, and Vraylar. The record supports the claimant presented for medication appointments on a monthly or bi-weekly basis from August 2019 through July 2020."[6] *Id*. But Michael testified on November 5, 2020 that he had been seeing Dr. Lieteau every two weeks for the "past several months or maybe even a year" for more than just medication management. *Id*. at 423.

Instead of fulfilling his affirmative duty to develop Michael's complete medical history, the ALJ used the missing evidence to discount Dr. Lieteau's favorable medical opinion. In particular, the ALJ found not persuasive Dr. Lieteau's conclusion that Michael's mental impairment would result in him being off task more than 30% of the day, missing 3 days of work per month, being on task only 40% of the time, and being unable to obtain and retain work in a competitive work environment on a fulltime basis. *Id*. at 399. As to the supportability of Dr. Lieteau's opinion, the ALJ discounted Dr. Lieteau's conclusions in part because she did not

---

[6] The medication records before the ALJ indicated that Michael treated with Dr. Lieteau on 14 occasions between September 2019 and September 2020. (R. 983-87, 1007-19, 1038-41, 1047-51, 1056-62, 1066-68, 1084-87, 1090-97, 1109-11, 1117-21) (treatment notes from September 18, 2019, November 19, 2019, January 14, 2020, March 10, 2020, May 12, 2020, June 9, 2020, July 7, 2020, July 14, 2020, July 28, 2020, August 11, 2020, September 8, 2020, September 15, 2020, September 22, 2020, September 29, 2020).

"explain any of the symptoms in her own" notes reflecting medication changes. *Id*. The ALJ wrote that the record indicated that Michael's "treatment with Dr. Lieteau, reflected changing medications, but there were no objective symptoms noted nor was there any explanation of the rationale behind the medication changes." *Id*. In other words, the ALJ relied on the absence of objective findings in the records documenting medication changes to discredit Dr. Lieteau's opinion.

The Commissioner notes that Michael's counsel did not raise any objection as to the sufficiency of the record at the hearing level. It is true that at the beginning of the hearing, Michael's counsel answered "No, Your Honor" when the ALJ asked if there was anything outstanding based on counsel's review of the record. (R. 411). Citing *Harris v. Saul*, 835 F. App'x 881 (7th Cir. 2020), the Commissioner argues that the ALJ was entitled to rely on counsel's statement at the hearing that the record was complete. *Id*. at 885 (holding it was reasonable for the ALJ to proceed to a decision on the record where claimant's "both wrote to the ALJ that the record was complete and stated that he had no objection to it at the hearing."). However, Michael's subsequent testimony provided a reason "why the ALJ should have investigated further after receiving this assurance" from Michael's counsel. *Krug v. Saul*, 846 F. App'x 403, 406 (7th Cir. 2021). Moreover, it is well established that the ALJ's independent duty to compile a complete record exists even when the claimant is represented by counsel. *Smith*, 231 F.3d at 437; 20 C.F.R. § 404.1512(b)(1); *Joseph Edward J. v. Comm'r of Soc. Sec.*, 2018 WL 4613206, at *6 (S.D. Ill. Sept. 26, 2018) (ALJ's independent duty to develop the record fully and fairly "is not eliminated where a claimant had counsel."). Based on Michael's subsequent testimony, there was reason in this case for the ALJ to think that Dr. Lieteau's treatment notes were missing. *Cf. Sutton v. Barnhart*, 183 F. App'x 555, 560 (7th Cir. 2006) (holding ALJ was not required to recontact

claimant's primary care physician and psychiatrist where "there was no reason for the ALJ to think any evidence was missing.").

Moreover, Michael's counsel did submit the records from Access to the Appeals Council as additional evidence. (R. 12-387). The medical records from Access submitted to the Appeals Council include 18 progress notes reflecting individual visits between Michael and Dr. Lieteau from September 18, 2019, November 19, 2019, January 14, 2020, March 10, 2020, May 12, 2020, June 9, 2020, July 7, 2020, July 14, 2020, July 28, 2020, August 11, 2020, September 8, 2020, September 15, 2020, September 22, 2020, September 29, 2020, October 20, 2020, November 3, 2020, December 1, 2020, December 23, 2020. (R. 192-95, 208-11, 215-18, 222-25, 246-48, 256-58, 266-68, 272-74, 281-83, 286-88, 292-94, 297-300, 310-12, 322-24, 333-35, 344-46, 354-57, 360-62). An examination of Michael's treatment from September 2019 to December 2020 shows that he consistently reported decreased concentration, dysphoric mood, sleep disturbance, and being nervous/anxious. *Id*. Dr. Lieteau noted ongoing symptoms of anxiety, depression, and bipolar disorder with impaired insight, judgment, concentration, and immediate memory. *Id*. The treatment notes also document a psychological decline between September 8, 2020 and December 1, 2020. *Id*. At all but one visit, Dr. Lieteau assigned GAF scores that indicated moderate to severe difficulty in Michael's psychological, social, and occupational abilities. *Gerstner v. Berryhill*, 879 F.3d 257, 263 (7th Cir. 2018).

Because the inclusion of Dr. Lieteau's treatment notes in the record may have led to a different decision, remand is warranted for consideration of the additional evidence from Access. *Wilder v. Kijakazi*, 22 F.4th 644, 654 (7th Cir. 2022) ("An error is harmless if, upon examination of the record, the court can predict with great confidence what the result of remand will be.") (internal quotation marks omitted). The absence of Dr. Lieteau's treatment notes created a gap in

12

the record and the ALJ clearly relied on this factor to support his decision. The only treatment notes in the record before the ALJ from a psychiatrist during the period Michael was seen at Access are from January 2019 through July 2019.[7] As a result, the record before the ALJ lacked treatment notes from a psychiatrist for 17 months of the 24-month mental health treatment period at Access. The ability to close this gap in treatment notes during the relevant period would have been significant. *Nelms*, 553 F.3d at 1099 (2-year gap in medical records was significant and prejudicial). The additional evidence fills certain gaps in the record that concerned the ALJ, such as Dr. Lieteau's notation of objective signs and symptoms and her explanations for the medication changes. Further, Dr. Lieteau's rating of Michael's GAF at 50 on ten occasions between September 2019 and December 2020 was consistent with the GAF scores Dr. Erhardt assigned to Michael on four occasions between March 2019 and July 2019. Thus, the ALJ might have assessed the severity of Michael's mental condition differently had this evidence been available for consideration. As a result, the Court cannot conclude with great confidence that the ALJ would have reached the same result if he had reviewed the missing treatment records. *Garner v. Berryhill*, 2018 WL 3830060, at *2-3 (N.D. Ind. Aug. 13, 2018) (reversing and remanding because of the omission from the record of progress notes from seven additional visits to claimant's treating physician).

From this failure to adequately develop a complete record, it follows that the ALJ's next rationale for discounting Dr. Lieteau's opinion is also not persuasive. The ALJ noted that Dr. Lieteau's actual assessment "did not provide specific support for her findings." (R. 399). As an initial matter, Michael contends that Dr. Lieteau answered the questions as asked on the Mental RFC Statement form and she should not be faulted for not providing a more detailed assessment

---

[7] Dr. Erhardt's treatment notes with Michael from August 19, 2019 are included in the additional records submitted to the Appeals Council but were not included in the record before the ALJ. (R. 157-59).

on the form. Michael is correct that a "doctor can hardly be faulted for checking off items or identifying by category the evidence that supports his opinion when the Mental Residual Functional Capacity form he completed requires him to do just that." *Hoffswell v. Berryhill*, 2018 WL 4005207, at *2 (N.D. Ill. Aug. 22, 2018). "In any event, the cure for [this] perceived ambiguit[y] was for the ALJ to seek clarification from [claimant's treating psychiatrist], not to reject [her] opinion out of hand." *Id*. Relatedly, "[a]lthough by itself a check-box form might be weak evidence, the form takes on greater significance when it is supported by medical records." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010). While the form Dr. Lieteau filled out did not provide specific explanations or citations to supporting records for the limitations she proposed, Dr. Lieteau did indicate that she based her opinion on Michael's "ongoing psychiatric outpatient treatment." (R. 921). The ALJ did not have access to Dr. Lieteau's treatment records, and thus, he was unable to assess whether her opinion was substantiated by and consistent with her own treatment records, which would lend the opinion "greater significance." *Larson*, 615 F.3d at 651. Because the medical record was not adequately developed, the ALJ's conclusion that Dr. Lieteau's assessment "did not provide specific support for her findings" cannot stand. On remand, after reviewing the additional records, including Dr. Lieteau's treatment notes, the ALJ shall evaluate and weigh the opinion evidence anew.

The two remaining reasons identified by the ALJ are not enough to justify his decision to reject Dr. Lieteau's opinion. The ALJ's third reason for rejecting Dr. Lieteau's opinion was that she "does not explain how a GAF score of 55 is consistent with the extreme limitations she assessed." (R. 399). The GAF is "a scale of 1 to 100 used by mental health clinicians and physicians to help determine how well a person is doing in adjusting to the psychological and other challenges of living; the higher the score, the better he's doing." *Price v. Colvin*, 794 F.3d 836, 839

(7th Cir. 2015). A GAF score of 55 suggests moderate difficulty with psychological, social, and occupational abilities. *Gerstner*, 879 F.3d at 263. Although the GAF has been criticized for subjectivity and is no longer widely used by psychiatrists and psychologists, *id.*, the Social Security Administration "still considers these scores as relevant, medical-opinion evidence." *Knapp v. Berryhill*, 741 F. App'x 324, 329 (7th Cir. 2018); *Gerstner*, 879 F.3d at 263 n. 1.

In rejecting Dr. Lieteau's opinions, the ALJ found the June 3, 2020 GAF score of 55 significant, but he did not explain how a GAF score of 55 is inconsistent with Dr. Lieteau's opinions. *Hoffswell*, 2018 WL 4005207, at *2 ("The ALJ does not explain, however, how a [GAF] score of 55, which indicates 'moderate symptoms or moderate difficulty with social and occupational functioning,' . . . is inconsistent with [the treating psychiatrist's] conclusions about the [30 percent or more] amount of time that [claimant] would be off task during a workday."). More importantly, the ALJ credited the GAF score assessed by Dr. Lieteau on June 3, 2020 in support of his decision to discredit Dr. Lieteau's opinion, but he discredited four lower GAF scores of 41-50 assessed by Dr. Erhardt between March 18, 2019 and July 1, 2019.[8] (R. 399, 865, 874, 890, 893). "[C]ourts have been wary about inconsistent use of GAF scores—*e.g.*, where ALJs use high GAF scores to support a finding of no disability, while at the same time dismissing the importance of GAF scores in discounting the claimant's lower scores." *Sara E. v. Kijakazi*, 2022 WL 4182404, at *5 (N.D. Ill. Sept. 13, 2022); *see also Carrillo v. Colvin*, 2015 WL 875672, at *5 (N.D. Ill. Mar. 2, 2015) (remanding where "the ALJ chose to rely on certain GAF scores, but then

---

[8] Dr. Erhardt's GAF scores in the range from 41 to 50 indicated a serious difficulty in psychological, social, and occupational abilities. *Gerstner*, 879 F.3d at 263. In discounting Dr. Erhardt's opinion that Michael had GAF scores of 41-50, the ALJ reasoned that the GAF scores: (1) were a clinician's judgment about the severity of an individual's symptoms or level of mental functioning at a particular moment in time, like a snapshot; (2) they do not provide a reliable longitudinal picture of the claimant's mental functioning; (3) they are relevant only for the period of time the clinician indicates, which may be considerably less than the period at issue; (4) they do not predict prognosis or treatment outcomes; and (5) they are not considered opinion evidence per the regulations. (R. 399).

15

he failed to consider all such scores in an equal or fair way or at least did not offer an explanation for his implicit belief that some were more reliable than others."). "The Seventh Circuit has held that this type of cherry-picking justifies a remand." *Carrillo*, 2015 WL 875672, at *5; *Price*, 794 F.3d at 839-40 (criticizing the ALJ's "[c]herry picking [the claimant's] GAF scores"); *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014) (holding ALJ improperly cherry-picked the medical record where he relied upon the claimant's "high-water mark GAF of 60 . . . to conclude that [claimant] was not substantially impaired" while failing to note other lower GAF scores). Accordingly, the ALJ's third reason is inadequate to support the ALJ's rejection of Dr. Lieteau's opinion.

Moreover, the ALJ's lack of access to Dr. Lieteau's treatment notes may have impacted his evaluation of Dr. Lieteau's opinion relating to Michael's GAF score. The ALJ believed that Dr. Lieteau's assessment of a single GAF score of 55 in June 2020 was important. However, Dr. Lieteau's treatment records reflect that Dr. Lieteau rated Michael's GAF score at 18 visits between September 18, 2019 and December 23, 2020. She rated Michael at GAF 60 (once), 55 (seven times), and 50 (10 times). (R. 194, 210, 217, 224, 248, 257, 268, 274, 282, 288, 293, 299, 312, 323, 334, 345, 356, 362). Thus, Dr. Lieteau's treatment notes appear to undermine the relevance of a single GAF score of 55 on June 3, 2020.

Finally, the ALJ found that Dr. Lieteau's assessment was inconsistent with the other assessments in the record from the state agency reviewing psychologists and a consultative psychological examiner, Dr. Kelly Jauren. (R. 399). It is unclear how the ALJ could determine that Dr. Lieteau's opinion which was explicitly based on her "ongoing psychiatric outpatient treatment" of Michael was inconsistent with the "other assessments of record" when the record strongly suggested that Dr. Lieteau's mental health treatment notes were not before him. In other

16

words, how could the ALJ evaluate whether Dr. Lieteau's opinion was supported and not inconsistent with other evidence in the record without having the medical evidence relied on by Dr. Lieteau? Thus, the fact that the ALJ was unaware of the contents of the treatment notes from 18 visits with Dr. Lieteau in the period between September 2019 and December 2020 undermines the ALJ's conclusion that Dr. Lieteau's opinion was inconsistent with other assessments in the record.[9]

In sum, for all of the above reasons, the Court finds that ALJ's explanations do not provide substantial evidence to discredit Dr. Lieteau's opinion. Accordingly, a remand is warranted to allow the record to be supplemented with the additional records from Access, including Dr. Lieteau's treatment notes, and for the ALJ to reconsider the decision in light of the expanded record.

---

[9] The Court notes that an ALJ must base his evaluation of a claimant's mental impairments on evidence from mental health professionals. *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995) (with mental illness, "health professionals, in particular psychiatrists, not lawyers or judges, are the experts on it."). The ALJ indicated that the February and August 2019 state agency psychological consultants' assessments were "only somewhat persuasive" because they did not "consider the claimant's anxiety symptoms, either how they may affect his ability to maintain attention or concentration nor [did they] address his reported difficulty engaging with others." (R. 399). Moreover, the ALJ found Dr. Jauren's January 2019 assessment to be only "somewhat persuasive" because she "did not provide a specific functional evaluation." *Id*; *see Suide v. Astrue*, 371 F. App'x 684, 690 (7th Cir. 2010) (doctor's "evaluation did not include a *functional* assessment of [claimant's] abilities, nor did she opine about any limitations [claimant's] impairments may have caused, so her report could not be used to support specific limitations included in [claimant's] residual functional capacity.") (emphasis in original); *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996) ("[g]iven that Dr. Lloyd failed to venture an opinion as to the extent of Books's limitations or as to his residual capabilities, the evidentiary usefulness of his findings is slight, at best."). Therefore, it is unclear how the ALJ determined Michael's mental RFC limitations from the remaining opinion evidence. Moreover, like the ALJ, the state agency reviewing and examining psychologists did not have the opportunity to review the treatment records and opinion of Dr. Lieteau.

## III. **CONCLUSION**

For the foregoing reasons, the Court grants Plaintiff's request for reversal and remand [14] and denies the Commissioner's Motion for Summary Judgment [19]. The ALJ's decision is reversed and this case is remanded to the agency for further proceedings consistent with this Opinion.

**SO ORDERED.**

Dated: November 7, 2022

Sunil R. Harjani
United States Magistrate Judge